**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| TENNESSEE SCENIC RIVERS ASSOCIATION and SIERRA CLUB, | ) ) ) | |
| *Plaintiffs*, | ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | ) ) | |
| WATER AND WASTEWATER AUTHORITY OF WILSON COUNTY and ADENUS OPERATIONS, LLC, | ) ) ) ) | |
| *Defendants*. | ) | |

Plaintiffs Tennessee Scenic Rivers Association ("TSRA") and Sierra Club file this Complaint against Defendants Water and Wastewater Authority of Wilson County ("WWAWC") and Adenus Operations, LLC ("Adenus") (collectively "Defendants"), and allege as follows:

<u>**STATEMENT OF THE CASE**</u>

1.      This is a citizen suit under Section 505(a)(1) of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. § 1365(a)(1), to address ongoing and unlawful discharges of polluted wastewater from a decentralized drip dispersal wastewater treatment facility located in Wilson County, Tennessee (the "Ridgewater facility") into an unnamed tributary of the Cumberland River at Old Hickory Lake (the "Unnamed Tributary"). Defendants WWAWC and Adenus discharge this polluted wastewater, which contains high levels of, among other constituents, *E. coli*, total coliform, and phosphorus, from the Ridgewater facility's land application area and other channelized conveyances described herein to the Unnamed Tributary, as well as through groundwater. This pollution travels a short distance downstream to the Cumberland River at Old

1

Hickory Lake and causes or contributes to bacterial impairment and harmful nutrient pollution, including excessive algal blooms and growth.

2. The Ridgewater facility is a "no discharge" decentralized drip dispersal wastewater collection and treatment system that is not intended nor authorized to discharge wastewater to surface waters. Instead, the facility relies on the application of wastewater to a land application area or "drip field" for treatment and assimilation into the soil environment. However, in what the Tennessee Department of Environment and Conservation ("TDEC") recently described as a "systemic issue," Defendants' years-long failure to properly design, install, operate, and maintain the Ridgewater facility's land application area has resulted in hydraulically overloaded and saturated soils, the chronic ponding of wastewater across the land application area, and the discharge of polluted wastewater offsite onto neighboring properties and into surface waters and drainage channels discharging to surface waters.

3. As demonstrated by numerous TDEC inspections and Notices of Violation and further evidenced by analytical sampling of wastewater discharged from the Ridgewater facility, Defendants WWAWC and Adenus have discharged and continue to discharge polluted wastewater from the facility's land application area and/or at least two channelized conveyances into the Unnamed Tributary without a National Pollutant Discharge Elimination System ("NPDES") permit authorizing such discharges. Sampling results show high levels of bacteria and nutrient pollution in these discharges to the Unnamed Tributary and in the Unnamed Tributary downstream from the discharges at levels far in excess of acceptable recreational standards.

4. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person into waters of the United States except as authorized by a NPDES

2

permit. Defendants WWAWC and Adenus are in violation of the CWA, 33 U.S.C. § 1311(a), because they have and continue to discharge polluted wastewater from the Ridgewater facility and at least two channelized conveyances to the Unnamed Tributary without a NPDES permit authorizing such discharges. Furthermore, WWAWC and Adenus are in violation of Section 301(a) of the CWA because they have and continue to discharge polluted wastewater from the Ridgewater facility's land application and/or these channelized conveyances through groundwater to the Unnamed Tributary without a NPDES permit authorizing such discharges.

5.　　Plaintiffs seek declaratory relief, injunctive relief, civil penalties, and costs of litigation, including reasonable attorney and expert fees and expenses.

<u>**JURISDICTION AND VENUE**</u>

6.　　This Court has subject matter jurisdiction over the CWA claims set forth in this Complaint against Defendants WWAWC and Adenus pursuant to Section 505(a) of the Act, 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.

7.　　TSRA and Sierra Club have complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A), Plaintiffs, on August 6, 2025, mailed a notice of intent to file suit under the CWA to Defendants WWAWC and Adenus, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Commissioner of the Tennessee Department of Environment and Conservation ("TDEC"), and the Director of TDEC's Division of Water Resources (hereinafter "August Notice," attached hereto as Exhibit "A" and incorporated by reference herein). The August Notice complied with 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R Part 135, Subpart A. More than sixty (60) days have passed since the August Notice was served on Defendants WWAWC and Adenus and these state and federal agencies.

3

8. Neither EPA nor TDEC has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or State to redress the violations of the CWA by Defendants WWAWC and Adenus. In addition, neither EPA nor TDEC has commenced a civil penalty action under Section 309(g)(6) of the Clean Water Act, 33 U.S.C. § 1319(g)(6), or under a comparable Tennessee law, to redress the violations of the CWA by Defendants as set forth in the August Notice.

9. Plaintiffs will, immediately upon receipt of a file-stamped copy of this Complaint, mail a copy to the Administrator of the EPA, the Regional Administrator of the EPA Region in which the violations are alleged to have occurred, and the Attorney General of the United States.

10. Venue is proper in the Middle District of Tennessee because the sources of the violations of the Act alleged herein are located within this judicial district. 33 U.S.C. § 1365(c)(1); 28 U.S.C. § 1391(b).

## PARTIES

11. Plaintiff Tennessee Scenic Rivers Association ("TSRA") is a non-profit corporation organized under the laws of the State of Tennessee that seeks to preserve, protect, and restore scenic and free-flowing rivers and streams within Tennessee. TSRA achieves these purposes and objectives through advocacy, education, stream monitoring, conservation, and seeking redress in the courts where necessary.

12. TSRA is a member organization with approximately 600 members, including members who own property and live by the Ridgewater facility, as well as members who swim, fish, boat, or otherwise recreate on, near, and around the Cumberland River at Old Hickory Lake and connected waters downstream of the Ridgewater facility. These members thus have property,

economic, recreational and aesthetic interests in the Unnamed Tributary, the Cumberland River at Old Hickory Lake, and connected waters.

13.     TSRA member Angela Stalcup owns property and resides with her husband, children, and pets in the Ridgewater Estates subdivision on property adjacent to the Ridgewater drip field. The Unnamed Tributary runs through Ms. Stalcup's property, and Defendants' illegal discharges of polluted wastewater at the northwest corner of the Ridgewater drip field into the Unnamed Tributary occur just upstream from her property line. A second conveyance along the northern edge of the Ridgewater drip field also abuts her property, and discharges of polluted wastewater from that conveyance empty into the Unnamed Tributary further downstream. Ms. Stalcup's use and enjoyment of her property has been lessened by Defendants' ongoing discharges of polluted wastewater containing high levels of bacteria and nutrients from the Ridgewater facility by, among other things, limiting her ability to fully utilize, use, and enjoy her backyard and the Unnamed Tributary due to health concerns. Defendants' ongoing discharges of polluted, nutrient-laden wastewater have also caused or contributed to algal blooms in the Unnamed Tributary which lessens her aesthetic enjoyment of her property. Defendants' discharges of polluted wastewater from the Ridgewater facility also harm Ms. Stalcup's recreational and aesthetic interests in Old Hickory Lake. Ms. Stalcup enjoys recreating on and swimming in Old Hickory Lake, but she now avoids swimming and recreating in the area where the Unnamed Tributary drains into Old Hickory Lake.

14.     The CWA violations alleged herein have directly and substantially harmed TSRA and its members, including Angela Stalcup, and lessened these members' property and economic interests, including the use and enjoyment of their property, as well as their recreational and aesthetic interests in the Cumberland River at Old Hickory Lake and connected waters

downstream from Defendants' discharges of polluted wastewater from the Ridgewater facility, including the Unnamed Tributary. TSRA members, including Angela Stalcup, would use and enjoy their properties, the Unnamed Tributary, and Old Hickory Lake more if the CWA violations alleged herein ceased.

15. TSRA is a "citizen" within the meaning of 33 U.S.C. §§ 1365(a) and 1365(g).

16. Sierra Club is a non-profit corporation whose mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the planet's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environment. Sierra Club pursues its mission through grassroots activism, public education, lobbying, and seeking redress in the courts when necessary.

17. Sierra Club is a member organization with over 600,000 members nationwide, including approximately 7,250 members who reside in Tennessee. Some of those members live by, recreate on, and otherwise use and enjoy the Cumberland River at Old Hickory Lake and its tributaries.

18. Sierra Club member Cris Corley, D.C., lives in Mt. Juliet, Tennessee on a piece of property abutting Spencer Creek, a tributary to Old Hickory Lake. Dr. Corley's property is also located a few hundred yards from Old Hickory Lake itself. Dr. Corley grew up recreating on Old Hickory Lake, and he owns kayaks and an electric boat which he enjoys using on Old Hickory Lake with friends and family. Defendants' illegal discharges of wastewater containing elevated levels of bacteria and nutrients from the Ridgewater facility harm Dr. Corley's recreational and aesthetic interests in Old Hickory Lake. Dr. Corley has stopped recreating on Old Hickory Lake where the Unnamed Tributary discharges into the lake because there is so much algal growth in that area that the algae blooms clog the propeller on his boat, and he cannot paddle through them

without algae and lake water splashing onto him. Dr. Corley is concerned about the health implications of coming into contact with contaminated algae and lake water. He also now avoids recreating on and swimming in Old Hickory Lake because of health concerns due to the Ridgewater facility's *E. coli* and nutrient discharges, and he has refrained from getting a dog because he is concerned that it will drink contaminated lake water in his neighborhood.

19.     Sierra Club is a "citizen" within the meaning of 33 U.S.C. §§ 1365(a) and 1365(g).

20.     The CWA violations alleged herein have directly and substantially harmed Sierra Club and its members, including Cris Corley, and lessened those members' recreational and aesthetic enjoyment of the Cumberland River at Old Hickory Lake and connected waters. Sierra Club members, including Cris Corley, would use and enjoy those waters more if the violations alleged herein ceased.

21.     These injuries will not be redressed except by an order from this Court requiring WWAWC and Adenus to take immediate action to halt their ongoing and unpermitted discharges of polluted wastewater to the Unnamed Tributary of the Cumberland River at Old Hickory Lake. Thus, enforcement by this Court as to TSRA and Sierra Club's claims asserted and relief sought in this Complaint, including injunctive relief to cease and remedy the violations and the imposition of civil penalties, would provide redress for the injuries suffered by TSRA and TSRA's members as well as Sierra Club and Sierra Club's members. Because these injuries are caused by pollution of waters of the United States, these injuries fall within the zone of interests protected by the Clean Water Act.

7

22.     The interests that TSRA and Sierra Club seek to protect in this lawsuit are germane to their purposes and objectives, but neither the claims asserted herein, nor any of the relief requested, require the participation of individual members in this lawsuit.

23.     Defendant WWAWC is a water and wastewater utility established pursuant to Tenn. Code Ann. § 68-221-601 *et seq.* to provide water and wastewater services to certain portions of Wilson County, Tennessee. At all times relevant hereto, Defendant WWAWC has owned the Ridgewater facility and contracted with Adenus to operate it.

24.     Defendant Adenus is a Tennessee limited liability company engaged in the business of wastewater collection and treatment with its principal office in Smyrna, Tennessee. At all times relevant hereto, Adenus has contracted with WWAWC to operate wastewater drip dispersal systems in Wilson County, Tennessee, including the Ridgewater facility.

25.     Defendants WWAWC and Adenus are "persons" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

## STATUTORY BACKGROUND

26.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States except in compliance with, among other conditions, a NPDES permit issued by the EPA or an authorized state pursuant to Section 402 of the Act, 33. U.S.C. § 1342.

27.     The Clean Water Act defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from a point source." 33 U.S.C. § 1362(12).

28.     The Clean Water Act defines "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological

materials, radioactive materials, heat, wreaked or discarded equipment, rock, sand, cellar dirt and industrial . . . waste discharged into water." 33 U.S.C. § 1362(6).

29.     The Clean Water Act defines "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

30.     The Clean Water Act defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

31.     The Clean Water Act defines "person" to include "an individual, corporation, partnership, association, State, municipality, commission, or a political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

32.     Under Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on their own behalf against any "person" who is alleged to be in violation of an "effluent standard or limitation" under the Act.

33.     The Clean Water Act defines "effluent standard or limitation" to include:

(1) .  . . an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; . . . (6) a certification under section 1341 of this title; . . . [or] (7) a permit condition thereof issued under section 1342 of this title . . .

33 U.S.C. § 1365(f).

34.     Citizen suits may enforce the provisions of and seek remedies for an unpermitted discharge in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311(a).  33 U.S.C. § 1365(a), (f)(1).

35.     Federal courts are authorized to issue injunctive relief under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a), and are authorized to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

36.     In citizen suits, courts may assess civil penalties against violators not to exceed $68,445 per day per violation for all violations of the Clean Water Act that occur after November 2, 2015, where penalties are assessed after January 8, 2025. 33 U.S.C. §§ 1319(d); 40 C.F.R. §§ 19.1–19.4 (updating statutory penalties to adjust for inflation).

## FACTUAL ALLEGATIONS

### Decentralized Drip Dispersal Systems in Tennessee

37.     Decentralized drip dispersal is a type of on-site wastewater treatment system favored by developers and utilities seeking to build out rural landscapes where pre-existing sewage infrastructure is not available or soils on individual lots are not suitable for conventional septic tank and drain field usage. These systems have primarily been used in Tennessee to serve residential subdivisions and other rural developments, and, if correctly utilized, can provide wastewater collection and treatment for up to several hundred homes in subdivision developments.

38.     Some decentralized drip dispersal systems, like the Ridgewater facility, consist of a septic tank effluent pumping system, often referred to as a "STEP" system, which collects domestic sewage from numerous locations or residences and pumps it to a treatment area. The wastewater is then preconditioned by circulation through a sand filter before being piped to a land application area or "drip field." At the land application area, drip lines that are buried underground release wastewater into the soil profile for critical additional treatment through

10

physical filtration, biological consumption of nutrients by soil-residing organisms, and pathogen die-off related to residence time.

39.     Successful treatment and assimilation of wastewater at the land application area occurs when soils are capable of receiving the total daily volume of applied wastewater, transmitting it away from the points of application, and maintaining an environment conducive to further treatment. Stated otherwise, drip fields must be capable of treating and assimilating applied wastewater loads without resulting in prolonged soil profile saturation, hydraulic overload of soils, ponding of effluent at the surface of the ground, or the discharge of wastewater offsite from the drip field area.

40.     To meet these objectives, drip fields must be adequately sized, located in areas with suitable soils, and operated with appropriate loading rates to allow impacted land application areas sufficient time to properly treat and assimilate wastewater into the soil environment. If these measures are not taken, drip field soils become saturated and overloaded resulting in degraded soil conditions that prevent those soils from performing required treatment and effective assimilation of pollutants, including bacteria and nutrients.

41.     Drip dispersal systems in Tennessee are permitted by TDEC under a "no discharge" State Operating Permit ("SOP") issued pursuant to the Tennessee Water Quality Control Act, Tenn. Code Ann. § 69-3-101 *et seq.* Among other requirements, these SOPs expressly prohibit any "discharge of wastewater to surface waters or to any location where it is likely to enter surface waters."

42.     Pursuant to a contractual relationship, Adenus operates all of the decentralized drip dispersal wastewater collection and treatment systems owned by WWAWC in Wilson County. Currently, Adenus operates approximately thirty-four such systems for WWAWC, many

11

of which were found by TDEC to have significant design and operational issues during a 2024 investigation discussed herein. Upon information and belief, over the past five years, WWAWC has paid Adenus more than $9,264,820 to operate its decentralized drip dispersal systems, including the Ridgewater facility.

**2024 TDEC Investigative Survey**

43.     In 2024, TDEC conducted a statewide investigative survey of approximately 360 permitted and operational decentralized drip dispersal facilities in Tennessee. TDEC was specifically concerned about the "common challenge" of hydraulic overloading of soil profiles at land application areas, observing that:

> One of the most challenging aspects of operating these systems ... involves the ability of the soil to receive and transmit the applied wastewater away from the point of application without resulting in prolonged soil profile saturation or ponding of wastewater on the surface of the ground. In many cases these ponded conditions result in overland flow of wastewater away from the identified land application area. ***Noncompliance of this type is particularly critical as in many cases the wastewater flows onto adjacent properties, residential yards, or drainageways and surface waters, but is not treated to levels or sampled at frequencies that are required for discharging systems***.[1]

44.     In its June 2024 report setting out its findings, TDEC found that over half of the decentralized drip dispersal systems in Tennessee are noncompliant with their SOP and approximately one-fourth of the systems exhibited problematic performance and operational issues, including systems where wastewater was not properly assimilating into drip field soils and was instead pooling, ponding, and flowing offsite onto adjacent properties and into drainageways and surface waters.

45.     The Ridgewater facility was one drip dispersal system identified by TDEC in its 2024 investigative survey as suffering from significant design and operational problems at the

---

[1] https://perma.cc/8AJJ-FKBZ.

facility's land application area, including hydraulically overloaded and saturated soils, the ponding or surfacing of wastewater, and the discharge of wastewater into drainage channels and surface waters.

**The Ridgewater Facility**

46.    The Ridgewater facility is a decentralized drip dispersal wastewater collection and treatment system located on Butternut Trail in Mount Juliet, Wilson County, Tennessee. The facility has been in operation since at least 2008 and collects domestic sewage from approximately eighty-nine homes in the Ridgewater Estates and Camelot Cove subdivisions. After collection, the sewage is pumped through a sand filter and then piped underground to the land application area, where it is dispersed via drip lines into the soil profile of the drip field for treatment and assimilation into the soil environment.

47.    WWAWC owns the Ridgewater facility and Adenus operates it. Both Defendants exercise control over the design, operation, and maintenance of the Ridgewater facility, and both are liable under the CWA for the unpermitted discharges of polluted wastewater from the facility's land application area to the Unnamed Tributary as alleged herein.

48.    The Ridgewater facility is located on a parcel of land in the Ridgewater Estates subdivision and is surrounded by residential lots on three sides and is directly adjacent to an Unnamed Tributary of the Cumberland River at Old Hickory Lake.



49.     The Ridgewater facility is permitted by TDEC pursuant to SOP-03009, which authorizes WWAWC to operate the system in a manner that allows for the land application of wastewater effluent onto a 6-acre drip field at a loading rate of 0.2 gallons per day per square foot ("gpd/sq.ft.").[2]

50.     The Ridgewater facility does not utilize a 6-acre drip field, but instead Defendants only utilize an undersized 1.9-acre land application area.

---

[2] The Ridgewater facility is also permitted under Underground Injection Control Authorization No. WLS0000288, which allows WWAWC to utilize subsurface distribution of sanitary waste.

51.     SOP-03009 is not a NPDES permit, and as referenced above, expressly prohibits the discharge of any wastewater to surface waters or to any locations where wastewater is likely to enter surface waters.

52.     SOP-03009 requires WWAWC to, prior to the piping of wastewater to the land application area, disinfect wastewater to meet an *E. coli* limit of 941 Most Probable Number ("MPN")/100 mL. However, WWAWC's Monthly Operating Reports ("MORs") show that Defendants have exceeded this limitation on at least four occasions in the past five years, including the third quarter of 2022 (>2419.6 MPN/100mL), the second quarter (>2419.6 MPN/100mL) and fourth quarter (>2420 MPN/100mL) of 2023, and the first quarter of 2024 (>2420 MPN/100mL). TDEC has also observed that WWAWC has frequently reported "inconsistencies" in quarterly *E. coli* results due to widely ranging values within single quarters.

53.     WWAWC's MORs also demonstrate that Defendants have, during the past five years, regularly applied wastewater effluent to the drip field at loading rates in excess of the 0.2 gpd/sq.ft. limitation. For example, WWAWC's MORs from the last quarter of 2024 and the first quarter of 2025 show that the undersized drip field was subjected to loading rates between approximately .24 and .33 gpd/sq.ft.

54.     As extensively documented by TDEC and further demonstrated by analytical sampling of wastewater discharged from the Ridgewater facility, the combination of the Ridgewater facility's undersized land application area, saturated and hydraulically overloaded soil profile, and low soil permeability, has resulted in the chronic ponding of wastewater in the drip field and the discharge of polluted wastewater into the Unnamed Tributary and drainage channels leading to the Unnamed Tributary.

15

**TDEC Inspections of the Ridgewater Facility**

55.     TDEC has conducted numerous inspections at the Ridgewater facility during the past five years.[3] During each of these inspections, TDEC has documented hydraulically overloaded and heavily saturated soils, algal growth, and the ponding of wastewater at the facility's land application area. TDEC has further documented numerous instances where wastewater from the drip field was discharging from the land application area into nearby drainage channels and the Unnamed Tributary.

*March 3, 2021 – TDEC Inspection and First Notice of Violation*

56.     On March 3, 2021, TDEC conducted an inspection of the Ridgewater facility after receiving complaints of ponded wastewater in the facility's drip field. At the land application area, the inspector observed, among other problems, "significant ponding" of wastewater effluent and "large areas of algae growth" covering substantial portions of the drip field. Bare patches of ground, algal growth, and ponded wastewater were observed on the western, northwestern, eastern, and central portions of the land application area.

57.     The inspector took several photographs to document these observations:

---

[3] TDEC's inspection reports and Notices of Violation for the Ridgewater facility can be found at: https://dataviewers.tdec.tn.gov/dataviewers/f?p=2005:34051:12852999331164:::34051:P34051_PERMIT_NUMBER:SOP-03009.

| Photo No. | Date |
|---|---|
| 6 | 3-3-21 |

**Description**
Western edge of the drip field. Note the bare regions, significant ponding water, and large areas of algae growth.

Photo taken by Jordan Fey using State-issued iPhone.



| Photo No. | Date |
|---|---|
| 7 | 3-3-21 |

**Description**
Northwestern area of the drip field. Bare patches, algae growth, standing water, and deep tire ruts.

Photo taken by Jordan Fey using State-issued iPhone.



17



| Photo No. | Date |
|---|---|
| 9 | 3-3-21 |

**Description**
Photo taken from roughly the center of the drip field, facing south. Note bare areas, standing water, deep ruts, and algae.

Photo taken by Jordan Fey using State-issued iPhone.

| Photo No. | Date |
|---|---|
| 12 | 3-3-21 |

**Description**
Pooled water with thick algal mat.

Photo taken by Jordan Fey using State-issued iPhone.

*Ponded effluent at the drip field on March 3, 2021.*

58.     On March 25, 2021, TDEC issued a Notice of Violation ("NOV") to WWAWC based on the observations and findings of the March 3 inspection. In the NOV, TDEC stated that the May 3 inspection found "significant ponding, areas devoid of vegetation, heavily saturated soils ... and algal mats on the drip field," which TDEC determined to be "indicative of an

overloaded or otherwise ineffective drip field." TDEC further found that the substantial algal growth at the land application area "indicates that the surface of the field remains wet well beyond just during and after rain events."

59.     The NOV also observed that although WWAWC's SOP applications represented that the Ridgewater drip field contained 6.89 acres of land application area, the drip field "only has approximately 1.9 acres of land application in use."

*January 8, 2024 – TDEC Inspection*

60.     On January 8, 2024, TDEC inspected the Ridgewater facility as part of its state-wide evaluation of decentralized drip dispersal facilities. The inspector again found significant problems with the facility's land application area, including evidence of hydraulic overloading with saturated soils and ponded wastewater. The inspector observed that the ponded effluent in the drip field appeared to be a long-term feature of the site, and that some of this ponded wastewater was flowing overland and offsite and discharging to surface waters or drainage features leading to surface waters.

61.     The inspector observed that no recent precipitation had occurred that would have influenced any of the problems found at the facility's land application area, and stated in the narrative portion of the inspection report:

> The land application area is ***severely overloaded and discharging to surface waters*** .... Over half of the available [land application] area was inundated with flow collecting at the north end of the area and leaving through a drainageway. ***Houses within feet of unfenced and failing application area***. [Emphasis added].

62.     The inspector took photographs documenting these observations and findings:



*Ponded effluent and algal growth at the drip field on January 8, 2024.*



*Ponded effluent in close proximity to neighboring houses on January 8, 2024.*

*June 11, 2024 – TDEC Inspection and Second Notice of Violation*

63.     On June 11, 2024, TDEC conducted another inspection of the Ridgewater facility. The inspector detailed many of the same problems with the land application area that were observed the previous January, including hydraulically overloaded and saturated soils, long-term ponding of wastewater, and overland flow of wastewater leaving the land application area and discharging to surface waters. The inspector described areas of the drip field as "flooded," and stated that Adenus personnel onsite were aware of these conditions. The inspector also documented that no recent precipitation had occurred to influence these site conditions.

64.     The TDEC inspector again took photographs as part of the inspection to document these conditions:



*Ponded effluent at the drip field on June 11, 2024.*     *Effluent flow in the Existing Drainage Ditch on June 11, 2024.*

65.     On October 1, 2024, TDEC issued another NOV to WWAWC arising out of the June 11, 2024 inspection of the Ridgewater facility. TDEC found that the June 11 inspection revealed several significant operational problems, including "active and long-term ponding of wastewater effluent, overland flow of wastewater effluent within the land application area, and wastewater effluent leaving the land application area and entering drainage features leading to surface waters." TDEC directed WWAWC to "[i]mmediately cease discharging sewage or other wastes to waters of the state, or to locations likely to enter waters of the state," and to thereafter "confirm all unpermitted discharges have ceased."

*December 3, 2024 – TDEC Inspection*

66.     Approximately two months after the October 1, 2024 NOV, TDEC returned to the Ridgewater facility for a site inspection on December 3, 2024. Like previous inspections, the TDEC inspector observed evidence of hydraulically overloaded and saturated soils, as well as ponded effluent over a large area of the land application area. The inspector also documented overland flow of wastewater effluent from the land application area leaving the site and discharging to surface waters or drainage features leading to surface waters. Again, the TDEC inspector reported no recent precipitation events that could have influenced these observed site conditions.

67.     The TDEC inspector described the land application area as "almost completely inundated with effluent," and that "[m]any locations exhibited surfacing of effluent and overland flow." The inspector reported that "[o]verland flow was clearly observed leaving the drip field area and into drainage ways along the rear of the homes on Ridgewater Way just north of the [land application area]. This drainage way was actively flowing." The TDEC inspection report

22

concluded that "[t]here was no apparent improvement in the conditions on site as compared to previous visits."

68.     In response to Defendants' asserted plans to construct a berm in an attempt prevent the overland discharge of wastewater from the land application site, the inspector stated that "Adenus staff were advised that constructing a berm would not be an appropriate remedy."

69.     Photographs taken at the inspection clearly show ponded wastewater in the land application area and overland flow of wastewater leaving the site through drainage channels that discharge to the Unnamed Tributary:



*Ponded effluent at the drip field on December 3, 2024.*          *Effluent flow in the Existing Drainage Ditch on December 3, 2024.*

70.     On December 26, 2024, WWAWC admitted in correspondence to TDEC that "[m]ore drip area is needed" for the Ridgewater facility "and is available at Camelot Cove."

However, as of the date of this Complaint, neither WWAWC nor Adenus have made any attempt to utilize this needed additional land application area.

*April 25, 2025 – TDEC Inspection*

71.     On April 25, 2025, TDEC conducted another inspection of the Ridgewater facility and discovered an unauthorized and illegal ground disturbance: "a freshly dug channel" had been excavated along the western edge of the land application area "leading directly to" the Unnamed Tributary. The inspector observed heavy equipment still onsite and "water flowing in the channel," as well as "some foam in channelized flow and a moderate sulfuric acid odor around the newly disturbed area."

72.     The TDEC inspector submitted photographic evidence of the unpermitted trench at the Ridgewater facility:



*Effluent in the Newly Constructed Trench on April 25, 2025.*

24



*Effluent Discharge to the Unnamed Tributary from the Newly Constructed Trench on April 25, 2025.*



*Effluent Discharge to the Unnamed Tributary from the Newly Constructed Trench on April 25, 2025.*

*April 30, 2025 – TDEC Inspection*

73.     Five days later, TDEC inspectors conducted a follow-up inspection of the Ridgewater facility to evaluate the unauthorized trench dug through the wastewater land application area. The inspectors observed that the trench, which was approximately 1-3 feet deep and 6-8 feet wide, "was constructed through an existing 'berm'" and that "[e]lements of the drip dispersal system were observed within approximately 10 feet of the ditch." The inspectors further observed that the new trench culminated at the northwestern edge of the drip field "into an established waterway," i.e., the Unnamed Tributary.

74.     In the report memorializing the visit, the TDEC inspectors noted that the Ridgewater drip field "has a history of overload, causing extensive saturation and ponded conditions as well as off-site discharge" and that "the rate at which the area is being loaded exceeds the infiltrative capacity of the soil causing the applied wastewater to come to the surface of the ground – as evidenced by long-term observation of area saturation and ponding." The report also noted that "[c]ontinued dosing of the [drip field] results in extensive ponding of wastewater on the surface of the ground and ultimately overland flow to the nearest surface drain."

75.     Given site conditions at the Ridgewater facility, the TDEC inspectors observed that "the construction and placement of the ditch had negative implications for the land application system" and "was not an accepted engineering practice." The inspectors recorded discussing alternatives with Defendants' employees onsite to "limit" the ability of wastewater effluent to enter the newly constructed trench and discharge to the Unnamed Tributary. As of the date of this Complaint, Defendants have not taken any measures to stop these unpermitted discharges.

26

*May 1, 2025 – TDEC Inspection*

76.    A TDEC inspector returned to the Ridgewater facility the next day, on May 1, 2025, to inspect and take photographs of the land application area and the new, unpermitted trench. During the inspection, the inspector observed wastewater discharging offsite from the drip field and into the Unnamed Tributary from two locations. The inspector documented that there had not been any precipitation events during the preceding week that would have influenced these conditions.

77.    First, the inspector observed and documented "flow from the flooded portion of the drip field" discharging into the newly constructed trench and discharging to the Unnamed Tributary. Second, he observed "significant flow continu[ing] to exit the area through the existing drainageway" leading to the Unnamed Tributary. He concluded that "[t]he recent drainage alterations appear to have redirected a portion of flow . . . to the new ditch and existing stream."

78.    The inspector attached photographs to the report to further document these observations:



May 1, 2025. Photo 1. Location where the newly constructed ditch is dug across the property line into the adjacent stream.

May 1, 2025. Photo 2. Facing east/southeast. Location where surface flow from the ponded areas of the drip field is entering the newly constructed ditch. Debris pile also identified in Photo 3.



May 1, 2025. Photo 4. Facing east. Existing drainageway along north property boundary of Ridgewater facility.



May 1, 2025. Photo 5. Facing east, further downgradient from Photo 4.

29

79.     On July 31, 2025, TDEC performed another inspection of the Ridgewater facility, the findings of which were reported in a September 9, 2025 NOV. This inspection was intended to cover the period of July 2020 through July 2025, and the inspectors noted that the April and May inspections "reported construction of a ditch along the western side of the treatment facility with flow from the drip field reaching a tributary on adjacent property."

80.     TDEC inspectors found that the unauthorized trench was dry (consistent with the lack of precipitation over the previous 48 hours) until they reached the northwest corner of the land application area. There, inspectors once again observed saturated soils and ponded wastewater flowing into the unauthorized trench and discharging to the Unnamed Tributary. The inspectors also found ponded wastewater with "duckweed and other wetland plants abundant" in the northwest corner of the land application area adjoining residential properties, and similar observations in the existing drainage ditch along the entire northern edge of the drip field. TDEC further documented another large area of ponded wastewater area on the drip field "with wetland vegetation growing." In fact, the inspectors were unable to walk this area of the drip field due to the ponding and overgrown conditions.

81.     The TDEC inspectors included a photo log in the NOV evidencing the conditions at the land application area described above:

**Description:**

Saturated soils and ponding in the northernmost portion of the ditch, flowing into adjacent property and tributary.

Photo taken by Teri Horsley using a State issued cell phone.



**Description:**

Heavy ponding continuing down north through the ditch and entering tributary.

Photo taken by Teri Horsley using a State issued cell phone.



**Description:**

Northwest edge of drip field backing onto Neighbors' backyard property line. Standing water with duckweed and other wetland plants abundant.

Photo taken by Teri Horsley using a State issued cell phone.



| Description: |  |
| --- | --- |
| Large ponded area on drip field with duckweed and excessive vegetation. | |
| Photo taken by Teri Horsley using a State issued cell phone. | |

82. The NOV concluded that "[t]he number of Out of Compliance inspections, surveys, and visits across multiple years and seasons, the continued presence of saturated ground and ponding, as well as the concerns provided to [TDEC] by the public, indicates that this is a systemic issue that must be addressed."

34

*September 16, 2025 – TDEC Inspection*

83.     TDEC returned to the Ridgewater facility on September 16, 2025 to evaluate whether Defendants had implemented any required corrective measures to address the facility's ongoing wastewater pollution problems. TDEC inspectors did not observe any such corrective measures but instead discovered a new illegal disturbance to the land application area: Defendants had excavated a *second* unauthorized trench in the land application area, this time through the center of the drip field. TDEC inspectors observed that this second trench was routing wastewater effluent from the land application area to the pre-existing discharge point at the northwest corner of the drip field into the Unnamed Tributary. Thus, instead of using the 60-day notice period to remedy the violations set out in the August Notice and come into compliance with the CWA, Defendants instead created *another* channelized conveyance leading to a pre-existing point source discharge from the drip field to the Unnamed Tributary.

84.     TDEC inspectors recorded that this new, second unauthorized trench measures "approximately 1.5 feet wide and approximately 1 to 3 feet deep" and extends "approximately 30 feet" into the land application area. The inspectors observed that the trench was excavated through the drip field so that a drip line from the land application area now hangs uncovered across the width of the trench. TDEC inspectors also observed wastewater actively flowing in the second newly constructed trench and discharging into the Unnamed Tributary.

85.     TDEC inspectors included photographs in their report evidencing this second unauthorized trench in the land application area:



Photo 1. September 16, 2025 @ 9:25 AM. Newly excavated trench (Trench A) extending into existing drip field.

36



Photo 2. September 16, 2025 @ 9:25 AM. Blue drip line extending across Trench A (see Photo 1).



Photo 3. September 16, 2025 @ 9:28 AM. Scale stick on approximate property boundary. There is no fence between the properties.



Photo 5. September 16, 2025 @ 9:26 AM. Standing off the northwest property corner, looking down at flow entering creek from Trench A.

86.     Inspectors also observed and included photographs in the report of algal-filled wastewater flowing from the existing drainage ditch at the northern border of the drip field into the Unnamed Tributary. The inspectors recorded that the Ridgewater facility had not received

rain for nine days, and moreover that the area where the facility is located was "identified as [being in a] Moderate Drought."



Photo 6. September 16, 2025 @ 9:32 AM. Shallow ditch running along the north end of the drip field.



Photo 7.  September 16, 2025 @ 9:32 AM.  Ponding water in shallow ditch.

*September 26, 2025 – TDEC Inspection*

87.     TDEC inspectors returned to the Ridgewater facility ten days after discovering the

second unauthorized trench in the drip field discharging wastewater to the Unnamed Tributary.

The inspectors again observed "discharge [] occurring" from the land application area. Although

there had been some rain in the area over the previous four days, TDEC inspectors reported that "[n]o surface water was identified coming onto the property." Nevertheless, the inspectors documented that the drainage ditch running along the northern boundary of the drip field was "actively flowing" and that wastewater was again discharging from the second, newly constructed trench "into the adjacent stream" i.e., the Unnamed Tributary.

88.     Photographs taken by TDEC during the inspection and included in the report confirm the inspectors' observations.



Photo 8.  September 26, 2025 @ 8:23 AM.   Newly excavated Trench A with drip line extending across Trench A.



Photo 9. September 26, 2025 @ 8:54 AM. Location where discharge from newly excavated Trench A was entering creek. Arrow indicates direction of flow.



Photo 11.  September 26, 2025 @ 8:34 AM.  Drainageway along north boundary of drip field. Ponding in drip field and flow occurring in drain.  Arrow indicates direction of flow.

**Defendants' Unpermitted Discharge of Polluted Wastewater from the Ridgewater Facility**

89.     As demonstrated by TDEC's inspections and NOVs, as well as analytical sampling conducted of wastewater discharged from the Ridgewater facility, Defendants have discharged and continue to discharge polluted wastewater from the Ridgewater facility, both directly and through groundwater, to the Unnamed Tributary from (1) the facility's land application area; (2) the drainage ditch along the northern property boundary of the facility's drip

44

field ("Existing Drainage Ditch"); and (3) the newly constructed trench on the western portion of

the land application area ("Newly Constructed Trench").[4]



90.    The Unnamed Tributary, a tributary to the navigable-in-fact Cumberland River at

Old Hickory Lake, is a relatively permanent stream that forms geographic features on official

---

[4] On October 2, 2025, TSRA and Sierra Club sent an Addendum to their August Notice detailing additional and ongoing CWA violations stemming from Defendants' operation of the Ridgewater facility ("Addendum"). Namely, Defendants' illegal construction of a second unauthorized trench through the Ridgewater drip field constitutes an additional point source that has and continues to cause polluted wastewater to be discharged into the Unnamed Tributary of the Cumberland River at Old Hickory Lake.

topographic maps and continuously flows during most months of the year and does not flow only in response to precipitation.

91. Both the Unnamed Tributary and the Cumberland River at Old Hickory Lake are designated by the State of Tennessee for, among other uses, fish and aquatic life and recreation. For purposes of safe recreational use, Tennessee and EPA have established a numeric water quality criterion for *E. coli* in these waters of 126 MPN/100 mL.

92. Defendants' discharges of polluted wastewater from the Ridgewater facility contain high levels of *E. coli*, which can cause sickness to humans and animals who come into contact with elevated *E. coli* levels in surface waters and otherwise render waters unsafe for recreational activities and other uses. Defendants' discharges of polluted wastewater also contain high levels of phosphorus, which trigger harmful algal blooms and growth that can suffocate streams and aquatic life and also cause these waters to be unsafe for recreational activities and other uses.

93. Sampling conducted of polluted wastewater discharged from the Ridgewater facility on April 24, 2025 from the (1) Existing Drainage Ditch and the (2) Newly Constructed Trench showed high levels of, among other constituents, *E. coli* (5170 MPN/100 ml) and Total Coliform (>2419 MPN/100 mL) in the first discharge, and *E. coli* (2910 MPN/100 mL) and Total Coliform (>2419 MPN/100 mL) in the second discharge.[5] Sampling in the Unnamed Tributary downstream of both discharges showed *E. coli* levels of 1920 MPN/100mL which greatly exceed EPA and Tennessee recreational standards.

---

[5] These levels, as well as those in the July 8, 2025 sampling event, greatly exceed the 941 MPN/100mL *E. coli* limitation that SOP-03009 requires *prior to* the effluent being sent to the land application area for treatment.

46

94.     Sampling conducted of polluted wastewater discharged from the Ridgewater facility on July 8, 2025 from the (1) Existing Drainage Ditch and the (2) Newly Constructed Trench to the Unnamed Tributary showed high levels of, among other constituents, *E. coli* (1299 MPN/100 ml), Total Coliform (>2419 MPN/100 mL), and Phosphorus (0.732 mg/L) in the first discharge, and *E. coli* (1046 MPN/100 mL), Total Coliform (>2419 MPN/100 mL), and Phosphorus (0.343 mg/L) in the second discharge. Sampling in the Unnamed Tributary downstream of both discharges showed *E. coli* levels of >2419 MPN/100mL which greatly exceed EPA and Tennessee recreational standards.

95.     The Ridgewater facility is located in a part of Tennessee that is known for its complex geologic and hydrogeologic conditions, including karst features, that can adversely impact the effectiveness of subsurface treatment and disposal of wastewater, particularly when land application area soils are saturated and overloaded. Shallow water table aquifers commonly exist within inches of drip dispersal systems and are hydrologically connected to groundwater in the underlying bedrock. These geologic conditions can provide a direct, rapid pathway for polluted wastewater to migrate to a receiving stream through discrete channels in bedrock, with little or no pollutant attenuation.

96.     These geologic and other conditions are also conducive to the formation of sinkholes, which can serve as a further conduit for wastewater to discharge directly into groundwater. During a February 11, 2013 site inspection of the Ridgewater facility, a TDEC inspector observed "three sinkholes" that had formed ".25 foot from the drip lines" within the land application area. The inspector instructed Defendants that "[f]uture expansion of the zones will require proper distances of separation be maintained" from the sinkholes.

## COUNT ONE:
## DIRECT DISCHARGE OF POLLUTANTS TO WATERS OF THE UNITED STATES
## WITHOUT AN NPDES PERMIT IN VIOLATION OF THE CLEAN WATER ACT

97.    Plaintiffs repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully restated herein.

98.    Section 301(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of the terms of, an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. Each discharge of a pollutant not authorized by an NPDES permit constitutes a separate violation of the CWA.

99.    A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for the discharge of pollutants into waters of the United States without a permit in violation of Section 301 of the CWA. 33 U.S.C. § 1365(f).

100.    Defendants' discharge of polluted wastewater from the Ridgewater facility's land application area, the Existing Drainage Ditch, the Newly Constructed Trench, and/or other channelized conveyances into the Unnamed Tributary constitute the discharge of a pollutant from a point source requiring an NPDES permit authorizing such discharge.

101.    Sewage and wastewater, including partially or inadequately treated wastewater, as well as *E. coli*, total coliform, and phosphorus, are "pollutants" within the meaning of the CWA. 32 U.S.C. § 1362(6).

102.    The Ridgewater facility's land application area, the Existing Drainageway, and the Newly Constructed Trench are all "point sources" within the meaning of the CWA. 32 U.S.C. § 1362(14).

48

103.    The Unnamed Tributary and the Cumberland River at Old Hickory Lake are waters of the United States as that term is used in the CWA and as it has been interpreted by the federal courts.

104.    Defendants have, every day since August of 2020 and on at least the following occasions, discharged polluted wastewater from the Ridgewater facility's land application area, the Existing Drainage Ditch, and/or the Newly Constructed Trench into the Unnamed Tributary without an NPDES Permit authorizing the discharges:

- <u>March 3, 2021</u>: Discharge of polluted wastewater from the Existing Drainage Ditch to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>January 8, 2024</u>: Discharge of polluted wastewater from the Existing Drainage Ditch to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>June 11, 2024</u>: Discharge of polluted wastewater from the Existing Drainage Ditch to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>December 3, 2024</u>: Discharge of polluted wastewater from the Existing Drainage Ditch to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>March 4, 2025</u>: Discharge of polluted wastewater from the Existing Drainage Ditch to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>April 24, 2025</u>: Discharges of polluted wastewater from (1) the Existing Drainage Ditch and (2) the Newly Constructed Trench to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>April 25, 2025</u>: Discharges of polluted wastewater from (1) the Existing Drainage Ditch and (2) the Newly Constructed Trench to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>May 1, 2025</u>: Discharges of polluted wastewater from (1) the Existing Drainage Ditch and (2) the Newly Constructed Trench to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>July 8, 2025</u>: Discharges of polluted wastewater from (1) the Existing Drainage Ditch and (2) the Newly Constructed Trench to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>July 31, 2025</u>: Discharges of polluted wastewater from the Newly Constructed Trench to the Unnamed Tributary to the Cumberland River at Old Hickory Lake.

- <u>September 16, 2025</u>: Discharges of polluted wastewater from the Existing Drainage Ditch to the Cumberland River at Old Hickory Lake.[6]

- <u>September 26, 2025</u>: Discharges of polluted wastewater from the Existing Drainage Ditch to the Cumberland River at Old Hickory Lake.

105.    As demonstrated by, among other things, the Ridgewater facility's undersized land application area, Defendants' longstanding failure to utilize necessary additional (and available) land application area for wastewater treatment, Defendants' hydraulic overloading of the Ridgewater land application area, TDEC's longstanding and continuing observations of severely saturated and overloaded soils and ponding of effluent at the Ridgewater land application area and the repeated discharge of polluted wastewater into surface waters, as well as TDEC's recorded observations of post-August Notice ongoing discharges from the Existing Drainage Ditch and Defendants' construction of another point source discharge of polluted

---

[6] Plaintiffs will seek leave to amend this Complaint to include Defendants' unlawful discharges of polluted wastewater from the Second Newly Constructed Trench into the Unnamed Tributary as detailed in the Addendum following expiration of the 60-day notice period.

wastewater into the Unnamed Tributary, these violations are ongoing and/or likely to recur as of the date of this Complaint.

106.    The requirement for a NPDES permit authorizing these discharges arose when WWAWC and/or Adenus first knew or should have known that polluted wastewater was being discharged from the Ridgewater facility to surface waters. Each day since that time is a violation of the CWA.

107.    Defendants WWAWC and Adenus should be subject to an enforcement order or injunction ordering them to cease their discharges of polluted wastewater from the Ridgewater facility into the Unnamed Tributary without an NPDES permit authorizing such discharges.

108.    Defendants WWAWC and Adenus should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

109.    For the purpose of assessing the maximum civil penalty for which Defendants are liable, each day that Defendants have discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 13119(d), for each day on which it has occurred or will occur after the filing of this Complaint.

**COUNT TWO:**
**"FUNCTIONAL EQUIVALENT" DISCHARGE OF POLLUTANTS TO WATERS OF THE UNITED STATES WITHOUT AN NPDES PERMIT IN VIOLATION OF THE CLEAN WATER ACT**

110.    Plaintiffs repeat, re-allege, and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully restated herein.

111.    An NPDES permit is also required where pollutants are discharged from a point source to waters of the United States through hydrologically connected ground water, where the

51

discharge is the "functional equivalent" of a direct discharge to navigable waters. *County of Maui v. Hawaii Wildlife Fund*, 140 S.Ct. 1462, 1476 (2020).

112.    Sewage and wastewater, including partially or inadequately treated wastewater, as well as *E. coli*, total coliform, and phosphorus, are "pollutants" within the meaning of the CWA. 32 U.S.C. § 1362(6).

113.    The Ridgewater facility's land application area, the Existing Drainageway, and the Newly Constructed Trench are all "point sources" within the meaning of the CWA. 32 U.S.C. § 1362(14).

114.    Defendants' discharges of polluted wastewater from the Ridgewater facility's land application area, the Existing Drainage Ditch, the Newly Constructed Trench, and/or other channelized conveyances, into the Unnamed Tributary through hydrologically connected groundwater constitute the "functional equivalent" of a direct discharge to surface waters requiring an NPDES permit authorizing such discharge. As discussed herein, among other factors, the transit time and distance traveled are short, and there is little to no pollutant attenuation due to geologic and hydrogeologic conditions.

115.    Defendants have, on every day since at least August of 2020, discharged polluted wastewater from the Ridgewater facility's land application area, the Existing Drainage Ditch and/or the Newly Constructed Trench into the Unnamed Tributary through groundwater without an NPDES permit authorizing the discharges.

116.    Given the facts set out in Paragraph 105, as well as the geologic and hydrogeologic conditions at the Ridgewater facility, these violations are ongoing and/or likely to recur as of the date of this Complaint.

117.    The requirement for a NPDES permit authorizing these discharges arose when WWAWC and/or Adenus first knew or should have known that polluted wastewater was being discharged from the Ridgewater facility to surface waters via groundwater. Each day since that time is a violation of the CWA.

118.    Defendants WWAWC and Adenus should be subject to an enforcement order or injunction ordering them to cease their discharges of polluted wastewater from the Ridgewater facility into the Unnamed Tributary through hydrologically connected groundwater without an NPDES permit authorizing such discharges.

119.    Defendants WWAWC and Adenus should be subject to the assessment of civil penalties for these violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365.

120.    For the purpose of assessing the maximum civil penalty for which Defendants are liable, each day that Defendants have discharged pollutants without a permit authorizing such discharges constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 13119(d), for each day on which it has occurred or will occur after the filing of this Complaint.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

(a)     Enter a declaratory judgment that Defendants WWAWC and Adenus have violated and are in violation of the CWA, 33 U.S.C. §§ 1311(a);

(b)     Enter an enforcement order or an injunction under the CWA ordering Defendants WWAWC and Adenus to cease and abate the discharge of pollutants from the Ridgewater facility into waters of the United States without an NPDES permit;

(c)     Order Defendants WWAWC and Adenus to pay civil penalties of up to sixty-eight thousand four hundred forty-five dollars ($68,445) per day per violation for all violations of the CWA set out in this Complaint, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a);

(g)     Award Plaintiffs their litigation costs, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

(h)     Award Plaintiffs any and all such further and additional relief as the Court deems just, proper, and equitable.

DATE: October 6, 2025

Respectfully submitted,

*/s/ Stephanie Biggs*
Stephanie Biggs, TN BPR No. 036734
George Nolan, TN BPR No. 014974
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
sbiggs@selc.org
gnolan@selc.org

James S. Whitlock, NC Bar No. 34304
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801
Telephone: (828) 258-2023
jwhitlock@selc.org
(Admission *pro hac vice* requested)

54