IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| TENNESSEE SCENIC RIVERS ASSOCIATION and SIERRA CLUB, | ) ) ) ) | Case No. 3:25-cv-01145 |
| *Plaintiffs*, | ) ) |  |
| v. | ) ) |  |
| WATER AND WASTEWATER AUTHORITY OF WILSON COUNTY and ADENUS OPERATIONS, LLC, | ) ) ) ) |  |
| *Defendants*. | ) |  |

## PLAINTIFFS' RESPONSE OPPOSING DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Tennessee Scenic Rivers Association ("TSRA") and Sierra Club respectfully oppose Defendants Water and Wastewater Authority of Wilson County ("WWAWC") and Adenus Operations, LLC ("Adenus")'s Motion to Dismiss Plaintiffs' Amended Complaint. [Docs. 24 & 25]. Through that Motion, Defendants do not request dismissal of the entire litigation; Defendants do not contest the standing of Plaintiff Sierra Club to prosecute claims under Section 505(a)(1) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1), and Defendants concede that Plaintiffs have alleged multiple days of violation of the Act. *See* [Doc. 25 at 5, 8].

Instead, Defendants request partial dismissal of Plaintiffs' claims on two grounds: First, Defendants argue that Plaintiff TSRA lacks standing because Defendant WWAWC required one of TSRA's members, Angela Stalcup, to sign an oppressive form adhesion contract so that she could obtain sewage treatment service for her home. Defendants advance that argument without

1

citing a single judicial opinion holding that a form contract that never mentions statutory claims can defeat claims for injunctive relief and civil penalties authorized by Congress under the CWA.

Second, Defendants ask the Court to narrow the scope of Plaintiffs' alleged violations of the CWA by ignoring direct evidence that Defendants are actively discharging wastewater into waters of the United States. Specifically, Defendants ask this Court to ignore Plaintiffs' detailed allegations about government inspection reports, factual findings by state regulators, the results of analytical sampling, and numerous photographs all showing that Defendants are discharging polluted wastewater into a tributary of the Cumberland River at Old Hickory Lake. Defendants make that request without citing any case law supporting the idea that trial courts, at the motion to dismiss stage, are free to ignore detailed allegations about admissible evidence.

Defendants' request to dismiss TSRA's claims for lack of standing contravenes the structure and terms of the CWA as established by Congress. Under Section 505 of the CWA, Congress authorizes citizens to act as "private attorneys general" by prosecuting suits against parties that discharge pollution into waters of the United States. 33 U.S.C. § 1365(a)(1); *Starlink Logistics, Inc. v. ACC, LLC*, 101 F.4th 431, 447 (6th Cir. 2024). Before filing a citizen suit, the CWA requires citizens to provide a 60-day notice of intent to sue to the U.S. Environmental Protection Agency ("EPA") administrator, the relevant state agency, and the alleged violator. 33 U.S.C. § 1365(b). That notice affords the government an opportunity to either step forward and prosecute the alleged violations or stand back and allow the private citizen to do so. *Id*.; *see also Starlink Logistics*, 101 F.4th at 447–448.

The remedies afforded under the CWA citizen suit provisions inure directly to the benefit of the United States. Those remedies include the imposition of statutory civil penalties to be paid into the U.S. Treasury and/or the imposition of injunctive relief intended to protect the nation's

2

waters. *Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 590 (6th Cir. 2004). Private citizens are not allowed to recover damages. *Id.* Thus, before a CWA citizen suit can be compromised or settled, a citizen plaintiff must notify U.S. Attorney General and the EPA of the proposed settlement, affording the government an opportunity to object. 33 U.S.C. § 1365(c). Nowhere does the CWA authorize a private citizen to compromise or waive claims inuring to the benefit of the United States by signing a form contract, without notice to the Attorney General or the EPA. Nowhere does Congress suggest that a form contract can supersede statutory claims authorized under the CWA, and Defendants cite no caselaw suggesting such.

In addition to being completely unprecedented, Defendants' motion contravenes basic tenets of Tennessee contract law. The form sewage service agreement signed by Mrs. Stalcup is an unenforceable contract of adhesion because WWAWC presented the form to Mrs. Stalcup on a "take or leave it" basis as she had no bargaining power and was seeking an essential service. In addition, the contract provisions are unconscionable, and therefore unenforceable, because they are illusory. The form contract requires everything of Mrs. Stalcup—to pay for sewage treatment services every month—and nothing of the party with superior bargaining power, Defendant WWAWC—absolving that utility of any obligation to provide "any level of quality of sewage treatment" services. [Doc. 19-1, Ex. A ¶ 10]. In other words, because WWAWC promised nothing specific to Mrs. Stalcup, it is impossible for Mrs. Stalcup to sue for breach, thus making the agreement illusory, unconscionable, and unenforceable as a matter of law and public policy.

This Court need not address the legal infirmities of Defendants' form contract, however, because Plaintiffs also rely upon the declaration of Stephanie Sullivan, a member of TSRA and its Director of Operations. *See* Ex. B. Ms. Sullivan's attested declaration contains ample facts establishing her Article III standing and TRSA's standing to proceed.

3

Defendants' attempt to limit the scope of Plaintiffs' alleged violations of the CWA is likewise without merit. Under the CWA's strict liability regime, factual allegations of pollutant discharges into waters of the United States, even without instream sampling data, is sufficient to state plausible claims under the CWA. Plaintiffs are not required to produce a sampling result for each alleged violation, particularly when, as here, state regulators took photographs or otherwise documented in public inspection reports the discharge of wastewater into an unnamed tributary of the Cumberland River.

## STATEMENT OF FACTS

The Ridgewater facility is a decentralized drip dispersal wastewater treatment system located in Wilson County, Tennessee. [Doc. 21 ¶ 1]. The system is intended to perform on-site wastewater treatment by collecting domestic sewage from local residences, pumping that sewage to a treatment area for circulation through a sand filter, and ultimately piping wastewater to a land application area or "drip field" where the wastewater receives final treatment in the soil. *Id.* ¶ 38. When properly designed, maintained, and operated, this type of system should never discharge wastewater offsite or into streams, rivers, or lakes. *Id*. ¶¶ 39–40, 54.

The Ridgewater facility services approximately 89 homes and is located within the Ridgewater Estates subdivision, where it abuts an unnamed tributary to the Cumberland River at Old Hickory Lake ("Unnamed Tributary"). *Id.* ¶ 48. Defendant WWAWC owns the facility, and it contracts with Defendant Adenus to operate it. *Id.* ¶ 47. The facility is permitted by the Tennessee Department of Environment and Conservation ("TDEC") under a state operating permit, SOP-03009. That state permit is <u>not</u> a National Pollutant Discharge Elimination System ("NPDES") permit that authorizes discharges to surface waters under the CWA. *Id.* ¶¶ 49, 51. In fact, SOP-

4

03009 specifically prohibits the discharge of wastewater to surface waters or to any location where wastewater is likely to enter surface waters. *Id.* ¶ 51.

TDEC has found that the Ridgewater facility suffers from "systemic issue[s]." *Id.* ¶ 82. Although the Ridgewater drip field is required to be 6-acres in size, it is less than two acres, and TDEC has observed that WWAWC and Adenus routinely overload the undersized drip field with wastewater effluent. *Id.* ¶¶ 50, 53, 59, 74. TDEC has found that "[c]ontinued dosing of the [Ridgewater drip field] results in extensive ponding of wastewater on the surface of the ground *and ultimately overland flow to the nearest surface drain*." *Id.* ¶ 74 (emphasis added).

Over the past five years, TDEC inspectors performed at least eleven site visits to the Ridgewater facility and repeatedly documented wastewater discharging from the facility into the Unnamed Tributary. *Id.* ¶¶ 60–67, 69, 71–72, 76–78, 80–81, 84–88, 94. TDEC recorded evidence of those unpermitted discharges in inspection reports, photographs, and analytical sampling. *Id.* Sampling from the Ridgewater drip field, point source conveyances, and the Unnamed Tributary downstream from those conveyances identified pollutant constituents in the wastewater effluent, including high levels of *E. coli*, Total Coliform, Phosphorus, Ammonia, and Nitrogen. *Id.* ¶¶ 93–95. TDEC's inspections demonstrate a pattern of unlawful discharges of polluted wastewater by Defendants, without a NPDES permit, into waters of the United States. *Id.* ¶¶ 54–55, 89, 105, 116.

## STANDARD OF REVIEW

Defendants argue that Plaintiff TSRA should be dismissed under Rule 12(b)(1) because that organization lacks standing and that a portion of Plaintiffs' claims should be dismissed under Rule 12(b)(6) for failure to state a claim. [Doc. 25]. Because Defendants have introduced outside evidence—a declaration by WWAWC's Executive Director and a form sewer service contract signed by Angela Stalcup—as part of its arguments, their motion under Rule 12(b)(1) should be

5

construed as a factual attack on subject-matter jurisdiction. *Bowers v. Wynne*, 615 F.3d 455, 457 (6th Cir. 2010). Thus, the court must weigh the conflicting evidence to determine if jurisdiction exists, and the court has broad discretion to consider affidavits, documents outside the complaint, and can even conduct an evidentiary hearing if necessary to resolve disputed jurisdictional facts. *See, e.g., Ohio Nat. Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir. 1990). When the court considers documents outside of the complaint, it must do so in a manner that is fair to the non-moving party. *Rogers v. Stratton Indus.*, 798 F.2d 913, 918 (6th Cir. 1986).

A motion under Rule 12(b)(6) should not be granted unless it appears beyond doubt that Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In reviewing a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to plaintiffs, accepts plaintiffs' allegations as true, and draws all reasonable inferences in plaintiffs' favor. *Id.*; *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007).

## ARGUMENT

## I. PLAINTIFF TSRA HAS STANDING TO SUE FOR DEFENDANTS' CHRONIC AND ONGOING VIOLATIONS OF THE CLEAN WATER ACT.

To establish standing under Article III of the U.S. Constitution, a plaintiff must allege a concrete and particularized injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and that is likely to be redressed by the requested relief. *Friends of the Earth,*

6

*Inc. v. Laidlaw Env't Servs., Inc.,* 528 U.S. 167, 180–181 (2000) (*citing Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–561 (1992)). An association like TSRA has standing when (1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit. *Laidlaw,* 528 U.S. at 181.

Defendants do not contend that Sierra Club lacks standing,[1] or that TSRA failed to demonstrate injury in fact, traceability, or redressability, or satisfied the second and third elements of associational standing. Instead, they assert that TSRA lacks standing because TSRA member Angela Stalcup does not have standing in her own right to sue for Defendants' violations of the CWA. Specifically, Defendants argue that Mrs. Stalcup would be barred from asserting these federal statutory claims due to three clauses (the "waiver provisions") contained in a form "sewer service contract" that Defendant WWAWC required Mrs. Stalcup—as a property owner within the Ridgewater Estates subdivision—to sign in order to receive residential sewage services. [Doc. 25 at 6–7]; [Doc. 19-1, Ex. A ¶¶ 10, 16, 17].

The Court should reject Defendants' argument, as the waiver provisions do not apply to Plaintiffs' federal CWA citizen suit claims seeking injunctive relief and civil penalties. Even if they could somehow be so construed, the contract is oppressive, illusory, and an unconscionable adhesion contract and the waiver provisions are unenforceable under Tennessee law.[2]

---

[1] When one party has Article III standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable. *Memphis A. Phillip Randolph Inst. v. Hargett,* 485 F.Supp.3d 959, 976 (M.D. Tenn. 2020) (internal citations omitted).

[2] In federal question cases, federal courts generally apply state substantive law of contract interpretation unless a distinct national policy or interest—not present here—requires using federal common law. *See* 32 Am. Jur. 2d Federal Courts § 371 (citing *Johnson v. City of Detroit,* 319 F.Supp.2d 756, 780 (E.D. Mich. 2004), *aff'd,* 446 F.3d 614 (6th Circuit 2006)).

7

### A. The Waiver Provisions Do Not Apply to TSRA's Clean Water Act Claims or the Relief Sought.

The plain language of the waiver provisions do not apply to Plaintiffs' CWA claims for unlawful discharges of pollutants. In Tennessee, contracts should be interpreted according to their plain terms, as those terms are commonly understood. *Pharma Conf. Educ., Inc. v. State*, 703 S.W.3d 305, 311 (Tenn. 2024). The waiver provisions are inapplicable to Plaintiffs' CWA claims both with respect to conduct covered and relief sought.

The waiver provisions provide, in pertinent part:

10. The Water Authority is not bound to supply any level of quality of sewage treatment and shall not be liable to Consumer for failure to supply sufficient sewage collection and treatment services. . . .

16. The Consumer hereby waives and shall hold the Water Authority harmless from any claims it may have against the Water Authority for damages, including, but not limited to, consequential damages, resulting from any entry upon Consumer's property or any action whatsoever and howsoever taken by Water Authority in the installation, inspection, maintenance or repair of the sewage system or waterline.

17. The Consumer shall have no right to compel by injunction or otherwise the Water Authority to furnish sewage collection and treatment services nor shall the Water Authority be liable in damages, including, but not limited to, consequential damages, to the Consumer for failure to furnish such service or an adequate level of service.

[Doc. 19-1, Ex. A ¶¶10, 16, 17].

These provisions attempt to shield Defendants from liability for damages related to "sewage collection and treatment services." Thus, Defendants' actions consolidating and transporting sewage from serviced homes to the Ridgewater facility (collection) for circulation in the sand filter and land application area (treatment) are the only actions contemplated by the waiver provisions. In contrast, Plaintiffs bring this CWA citizen suit alleging that Defendants are engaging in improper wastewater *disposal* practices which result in unpermitted discharges of pollution into

8

waters of the United States.[3] Defendants' violations of the CWA at the Ridgewater facility involves a situation uncontemplated by the sewer service contract—that WWAWC is discharging polluted wastewater offsite and contaminating nearby surface waters. Because the sewer service contract lacks any mention of wastewater disposal—and does not attempt to shield Defendants from any related, unlawful conduct—the waiver provisions plainly don't apply to the alleged facts here.

Second, Plaintiffs—as expressly provided for under the CWA and its citizen suit provision—seek injunctive relief and civil penalties, as well as litigation costs, for Defendants' unpermitted discharges of polluted wastewater from the Ridgewater facility into the Unnamed Tributary. *See, e.g.,* [Doc. 21 ¶¶ 1–5, 108–10, 119–21]. Plaintiffs do not assert claims for damages, because they cannot under the CWA. As the Sixth Circuit has observed:

> The CWA limits the remedies available to citizen plaintiffs to injunctive relief, the assessment of civil penalties, and attorney's fees. *No compensatory damages are authorized under the CWA.* Furthermore, civil penalties are payable to the United States Treasury.

*Ailor,* 368 F.3d at 590 (emphasis added) (internal citations omitted). The waiver provisions make no reference to statutory claims, civil penalties, or the CWA, and Defendants cite no authority supporting the proposition that parties who sign form contracts, without notice to the United States, can waive statutory claims authorized by Congress and inuring to the nation's benefit.

**B. The Sewer Service Contract is an Adhesion Contract, and the Waiver Provisions Are Oppressive, Unconscionable, and Unenforceable.**

An adhesion contract is defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a

---

[3] 33 U.S.C. § 1365(a)(1), as relevant here, authorizes private enforcement actions *only* for alleged violations of an "effluent standard or limitation," which is defined to include the unpermitted discharge of a pollutant. 33 U.S.C. 1365(f); 33 U.S.C. § 1311(a). The failure to provide "sewage collection and treatment services" is not a violation of an effluent standard or limitation actionable under the CWA's citizen suit provision.

9

realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996) (internal citations omitted). The essence of adhesion is that the parties' bargaining positions and leverage enable one party to "select and control risks assumed under the contract," and the "distinctive feature of a contract of adhesion is that "the weaker party has no realistic choice as to its terms." *Id.* (internal citations omitted). Courts will not enforce provisions of adhesion contracts that are oppressive to the weaker party, which serve to limit the liability of the stronger party, or are unconscionable. *Id.*; *see also Wofford v. M.J. Edwards & Sons Funeral Home Inc.,* 490 S.W.3d 800, 817 (Tenn. Ct. App. 2015) (finding funeral services contract was adhesion contract because, among other reasons, plaintiff had "no realistic choice but to acquiesce" in signing the contract since she had already taken several concrete actions "to put the plan for funeral services in motion").

Defendant WWAWC's sewer service contract is demonstrably an adhesion contract. It is a standardized form prepared by WWAWC, the party with superior knowledge of sewage treatment services as compared to residential customers like Mrs. Stalcup. WWAWC offered that form contract to Mrs. Stalcup on a "take it or leave it" basis as the only provider of residential sewage services to her property, and it provided Mrs. Stalcup with no realistic opportunity to bargain. Ex. A, ("Stalcup Decl.") ¶¶ 1, 4. Further, when she signed the sewer services contract, Mrs. Stalcup had already purchased her property, taken out a mortgage, and moved her family from North Carolina to her new residence. *Id.* ¶ 3. Because she could not live in her home without sewer service, she had no realistic alternative other than to acquiesce to the terms of the form contract.

In addition to the adhesive nature of the contract, the waiver provisions are also unenforceable because they are unconscionable and illusory. In Tennessee, a contract is

unconscionable when the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest or fair person would accept them on the other." *Philpot v. Tenn. Health Mgmt., Inc.*, 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007) (internal citations omitted); *Wofford,* 490 S.W.3d at 818. A contract is illusory, and therefore unenforceable, when it affords the stronger party "complete discretion to decide whether to" perform. *Pharma Conf. Educ., Inc.*, 703 S.W.3d at 314.

The sewer service contract is unconscionable and illusory because the agreement is entirely one-sided in favor of WWAWC and oppressive to Mrs. Stalcup. Although the contract requires Mrs. Stalcup to pay for sewage treatment services every month, the waiver provisions state that WWAWC "is not bound to supply any level of quality of sewage treatment and shall not be liable to Consumer for failure to supply sufficient sewage collection and treatment services." [Doc. 19-1, Ex. A. ¶ 10]. Thus, the only specific task that WWAWC promises to perform is to take Mrs. Stalcup's money.

While requiring Mrs. Stalcup to pay monthly sewage service bills, the form contract also requires Mrs. Stalcup to waive and hold WWAWC harmless for any damages resulting from "any action whatsoever and howsoever taken by [WWAWC] in the installation, inspection, maintenance, or repair of the sewage system or waterline." *Id.* ¶16. The contract forbids Mrs. Stalcup from compelling WWAWC to furnish sewage collection and treatment services, and it declares that WWAWC is not liable in damages for the failure to "furnish such service or an adequate level or service." *Id.* ¶¶ 16, 17. In addition, the contract obligates Mrs. Stalcup to pay "reasonable cost of collection, including court costs, reasonable attorney's fees, and litigation expenses" in the event she fails to pay her sewage bills in a timely manner. *Id.* ¶ 9.

11

## C. The Waiver Provisions Are Unenforceable Exculpatory Clauses That Violate Public Policy.

The waiver provisions are also unenforceable exculpatory clauses. In Tennessee, the enforceability of exculpatory provisions is determined by considering the totality of the circumstances and weighing three non-exclusive factors: (1) the relative bargaining power of the parties; (2) the clarity of the exculpatory language; and (3) public policy and public interest considerations. *Copeland v. Healthsouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 273–74 (Tenn. 2018). These factors and the totality of the circumstances require a finding that the subject waiver provisions are unenforceable as being against public policy.

As explained in Section B above, there was complete disparity in bargaining power between Mrs. Stalcup and WWAWC when WWAWC required Mrs. Stalcup to sign the form contract. Sewage service was essential to Mrs. Stalcup's ability to occupy her newly mortgaged home, and WWAWC offered that essential service to her on a "take it or leave it" basis. As stated by the court in *Copeland*, "a standardized form offered on a take it or leave it basis may be invalid if there was great disparity of bargaining power, no opportunity for negotiation, and the services could not be obtained elsewhere." *Id*. at 274 (internal citation omitted).

The overbroad and ambiguous nature of the waiver provisions also militates in favor of finding them unenforceable. To be enforceable, an exculpatory provision must be "so clear and understandable that an ordinary and knowledgeable person will know what he or she is contracting away," and must also "alert the party agreeing to the exculpatory provision that the provision concerns a substantial right." *Id*. at 274–75 (internal citations omitted). A party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing, and the language should not relieve the exculpated party from liability for any injury for any reason. *Id*. at 271, 275.

12

In *Copeland*, the court found the exculpatory language at issue to be overly broad and ambiguous because it was all-encompassing and did not make it clear and unmistakable what rights Mr. Copeland was giving up by signing the agreement. *Id.* at 278. As explained above, the subject waiver provisions say nothing about statutory claims, civil penalties, or rights and obligations under the federal CWA. No provision in the form contract would inform a lay person that she is relinquishing rights conferred by Congress to address unlawful pollution of the nation's waters.

Moreover, enforcement of the waiver provisions against Mrs. Stalcup—particularly in the context of associational standing under the CWA—would be contrary to public policy. Whether the public interest is implicated can be determined by considering whether a party to the transaction has a public service obligation, "such as a public utility." *Id.* at 275. In deciding whether enforcement of exculpatory provisions is against public policy, courts consider whether the services involved are "of great importance to the public" and are thus a "practical necessity." *Id.* at 276. In addition, a "private contract violates public policy if it conflicts with the constitution, statutes, or judicial decisions of this state or tends to be harmful to the public good, the public interest, or public welfare." *Id.* at 275; *see also Crawford v. Buckner*, 839 S.W.2d 754, 756 (Tenn. 1992) (holding exculpatory clause in residential lease limiting landlord's liability to tenant was void as against public policy); *Childress ex rel. Childress v. Madison Cnty.*, 777 S.W.2d 1, 4 (Tenn. Ct. App. 1989) (party cannot contract away liability if the duty under which he acts is a public one).

In this case, WWAWC has a public service obligation to its customers, and residential sewage collection and treatment are unquestionably of great public importance and practical necessity.[4] Moreover by filing this CWA citizen suit, Plaintiffs are acting "as private attorneys

_____

[4] The Water and Wastewater Treatment Authority Act expressly provides that WWAWC's

general and, accordingly, the purpose of such suit is to protect and advance the *public's interest* in pollution-free waterways *rather than to promote private interests.*" *Pa. Envt'l Def. Found. v. Bellefonte Brough*, 718 F. Supp. 431, 434 (M.D. Pa. 1989) (emphasis added); *Deschutes River All. v. Portland Gen. Elec. Co.*, 249 F.Supp.3d 1182, 1187 (D. Or. 2017) (stating that citizen suits "perform an important public function" and "should be handled liberally"). Thus, allowing unconscionable exculpatory provisions to preclude TSRA's claims would undermine important public policy decisions made by Congress.

## II.  TSRA HAS STANDING BASED ON FACTS CONTAINED IN THE DECLARATION OF STEPHANIE SULLIVAN.

The Court need not address the inapplicability and legal infirmities of WWAWC's form adhesion contract, because—as alleged in the Amended Complaint—other members of TSRA have Article III standing to pursue that organization's CWA claims. [Doc. 21 ¶¶ 12, 14]. Addressing Defendants' Rule 12(b)(1) challenge, Plaintiffs provide the declaration of Stephanie Sullivan. *See* Ex. B ("Sullivan Decl.").

Ms. Sullivan is a member of TSRA and serves as that entity's Director of Operations. Sullivan Decl., ¶ 2. She lives near the Cumberland River downstream of the Ridgewater facility's unlawful discharges, and she frequently paddles the Cumberland River in her kayak. *Id.* at ¶¶ 5–6, 8–9, 11. Ms. Sullivan recently paddled 450 river miles of the Cumberland River, including in Old Hickory Lake above and below the Ridgewater facility, and she camped on two islands in Old Hickory Lake as well as on the lake's shores. *Id.* ¶ 10. Ms. Sullivan cares deeply about the Cumberland River, recreates on the river often, and receives her residential drinking water from the river downstream of Defendants' unlawful wastewater discharges. *Id.* ¶¶ 5–6, 8–9, 15. Sewage

_____

operation of wastewater treatment works "is declared to be for a public and governmental purpose and a matter of public necessity." Tenn. Code Ann. § 68-221-602.

14

pollution in the Cumberland River directly impacts Ms. Sullivan's life, harms her recreational and aesthetic interests, and threatens her health. *Id*. ¶¶ 11, 14–17. Thus, because Ms. Sullivan has standing to sue in her own right, TSRA has standing to pursue its claims under the CWA.

### III. PLAINTIFFS HAVE STATED A CLAIM FOR DEFENDANTS' CHRONIC AND ONGOING VIOLATIONS OF THE CLEAN WATER ACT.

The CWA is a strict liability regime that is "relatively straightforward: get a permit or do not pollute." *Ky. Waterways All. V. Ky. Utils. Co.*, 905 F.3d 925, 928 (6th Cir. 2018) *abrogated on other grounds by Cnty. of Maui, Haw. v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1468 (2020). To successfully state a claim under the Act, Plaintiffs must plead facts sufficient to allege that Defendants "(1) discharged, *i.e.*, added (2) a pollutant (3) to navigable waters (4) from a point source (5) without an NPDES permit." *Tri-Realty Co. v. Ursinus Coll.*, 124 F. Supp. 3d 418, 458 (E.D. Pa. 2015) (cleaned up); *Cnty. of Maui, Haw.*, 140 S. Ct. at 1468.

In their Memorandum, Defendants do not dispute four of those elements: (1) that wastewater, and certain constituents thereof, are pollutants under the CWA; (2) that the Unnamed Tributary is a navigable water; (3) that the Ridgewater land application area, the Existing Drainage Ditch, the Newly Constructed Trench, and the Second Newly Constructed Trench are point sources; and (4) that Defendants do not have a NPDES permit authorizing any of the alleged discharges of pollutants from the Ridgewater facility to the Unnamed Tributary.

Defendants instead focus their arguments squarely on the first element of the CWA inquiry: whether Plaintiffs have adequately alleged the *discharge* of pollutants from the Ridgewater land application area to the Unnamed Tributary. Defendants falsely contend that Plaintiffs' Amended Complaint "alleges only two instances where TDEC allegedly found pollutants present in 'navigable waters.'" [Doc. 25 at 8]. Defendants claim that instream sampling of impacted waterbodies is required to state a claim for an unpermitted discharge of pollutants, and that

15

Plaintiffs have failed to meet that burden. *Id.* at 10. Defendants then argue that the factual allegations in the Amended Complaint showing only two instances of analytical sampling confirming the presence of constituents associated with sewage pollution being present in downstream waters is insufficient to plead claims for ongoing or intermittent violations. *Id*.

Defendants' arguments fail because the CWA does not require plaintiffs to conduct sampling in impacted waterways in order to allege the unlawful discharge of a pollutant. Although such sampling can be used in a citizen suit, so too can other qualitative and quantitative forms of evidence such as inspection reports, photographs, other government records, and analytical sampling conducted prior to discharge, all of which are alleged in the Amended Complaint. Moreover, among other things, *see* [Doc. 21 ¶ 105], Plaintiffs' factual allegations of direct and circumstantial evidence of discharges from the Ridgewater facility on at least thirteen separate occasions show that Defendants' unpermitted pollution of the Cumberland River at Old Hickory Lake is ongoing.

Defendants do not dispute the exhaustive factual allegations of unpermitted wastewater discharges in the Amended Complaint; rather, they attempt to undermine its value by mischaracterizing the law. Defendants' position is at odds with the text of the CWA and relevant caselaw.

## A. Plaintiffs Are Not Required to Conduct Instream Sampling of Impacted Waterways to State a Claim of Unpermitted Discharges in Violation of the CWA.

The cornerstone of Defendants' Rule 12(b)(6) argument rests on the erroneous premise that instream sampling of a receiving waterbody is necessary to adequately allege unlawful pollutant discharges under the CWA. [Doc. 25 at 8–10]. Without citing a single case supporting that proposition, Defendants ask the Court to ignore the narrative, photographic, and scientific evidence contained in over a dozen state site inspection reports, Notices of Violation, and effluent sampling

16

reports, and they ask the Court to find that Plaintiffs have only stated a claim for violations of the CWA on two dates: April 24 and July 8, 2025. *Id.*

Defendants' arguments lack merit because sampling of a receiving waterbody is not required to state a claim for violations of the CWA. Instead, the instream, point source (prior to discharge), and land application sampling results cited in the Amended Complaint, as well as the other qualitative and quantitative evidence alleged by Plaintiffs, all constitute factual evidence "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

 The CWA defines "discharge of a pollutant" broadly to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A). Under the CWA's strict liability regime, the only question is whether a pollutant has been *added* to navigable waters—not the effect of that pollutant on receiving waters post-discharge. *See United States v. Hubenka*, 438 F.3d 1026, 1035 (10th Cir. 2006) (to state a claim for an unpermitted discharge, plaintiff need not prove a discharge caused any deleterious effect on downstream waters) (internal citations omitted). Thus, the courts that have directly addressed the question of whether instream sampling is necessary to support a CWA claim have decisively found that it is not.

For example, in *Tri-Realty Company v. Ursinus College*, the court noted that "[a]lthough proof that a pollutant is being released into or is present in navigable waters is extremely persuasive evidence of a discharge of a pollutant, a plaintiff may survive summary judgment even without such proof." 124 F. Supp. 3d at 469 (internal citations and quotations omitted). Relatedly, in response to a defendant's argument that plaintiffs needed to provide sampling of pollutant runoff to allege CWA violations, the court in *Environmental Protection Information Center v. Pacific Lumber Co.*, stated plainly that "there is no such requirement" and that the plaintiff "need not

17

conduct sampling . . . in order to demonstrate a discharge." 469 F. Supp. 2d 803, 819 (N.D. Cal. 2007). In the present case, during the motion to dismiss stage, Plaintiffs' burden is far less demanding than during the summary judgment stage. *See Peatross v. City of Memphis*, 818 F.3d 233, 245 n. 7 (6th Cir. 2016) (comparing the "less stringent" standard of review for a motion to dismiss with the standard for a motion for summary judgment).

Rather than requiring instream sampling results, courts routinely find that allegations of multiple forms of evidence are sufficient to allege the unlawful discharge of pollutants in violation of the CWA. For example, in *Friends of Sakonnet v. Dutra*, the court cited favorably and without distinction both "testimony and documentation of testing" as evidence of unlawful sewage discharges from a failing wastewater treatment system. 738 F. Supp. 623, 636 (D. R.I. 1990). There, in response to the defendants' motion for summary judgment, the court held that "[s]imple averments that there is no proof of pollution have no weight in the face of plaintiffs' direct proof." *Id.*; *see also Draper v. H. Roberts Family, LLC*, No. 1:06-CV-3057-CC, 2009 WL 10668404, at *16 (N.D. Ga. Mar. 30, 2009) (finding no genuine dispute regarding whether pollutant-laden stormwater was discharging from a subdivision based on expert testimony and reports, lay witness testimony, and correspondence and reports from state and county regulatory bodies); *State of Ga. v. City of E. Ridge, Tenn.*, 949 F. Supp. 1571, 1577 (N.D. Ga. 1996) (finding no genuine factual dispute of pollutant discharges based on eyewitness testimony, effluent samples, photographs, and video evidence).

Even when no analytical sampling has occurred—either within a point source conveyance or receiving waterbody—courts have found that plaintiffs adequately allege facts of pollutant discharges when they rely on other forms of evidence. For example, the Sixth Circuit held that trial testimony of "trash," "garbage," and various "filters" being burned and their residue dumped

18

into federal waters without a permit was sufficient evidence to establish pollutant discharges in violation of the CWA. *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 590 (6th Cir. 1999). In *Environmental Protection Information Center*, the court found that eyewitness observations, photographs, video, and turbidity measurements provided sufficient facts of pollutant discharge to defeat defendants' motion for summary judgment. 469 F. Supp. 2d at 819; *see also Tenn. Riverkeeper, Inc. v. City of Lawrenceburg*, No. 1:20-cv-00052, 2023 WL 4611816, at *8–9 (M.D. Tenn. July 18, 2023) (motion for summary judgment denied based on eyewitness testimony and expert opinion of pollutant discharges). Courts frequently hold that "proof of a *release* of a pollutant that reaches a conveyance, combined with proof that the conveyance leads to navigable waters, may be sufficient to prove a 'discharge of a pollutant' under the CWA." *Tri-Realty Co.,* 124 F. Supp. 3d at 469.

At this most permissive pleading stage, Plaintiffs' Amended Complaint alleges ample evidence of Defendants' unlawful discharges to the Unnamed Tributary. Such evidence includes written statements in state inspection reports and Notices of Violation [Doc. 21 ¶¶ 61, 63, 65, 66, 67, 71, 74, 76, 77, 80, 83, 84, 86, 87], photographs [*Id.* ¶¶ 62, 64, 69, 72, 78, 81, 85, 86, 88, 95], and effluent sampling results from the land application area [*Id.* ¶ 95], Existing Drainage Ditch [*Id.* ¶¶ 93–95], Newly Constructed Trench [*Id.* ¶¶ 93–94], Second Newly Constructed Trench [*Id.* ¶ 95], and the Unnamed Tributary [*Id.* ¶¶ 93–94].

**B. Sampling Results Cited in the Amended Complaint Provide Factual Evidence that Defendants Have Unlawfully Discharged Pollutants in Violation of the Clean Water Act.**

Although not required, sampling evidence which identifies pollutants in point source conveyances prior to discharge to waters of the United States and in waters downstream of point source discharges have both been found by the courts to sufficiently allege the "discharge" of a pollutant under the CWA. *See Tri-Realty Co.*, 124 F. Supp. 3d at 469–471 (sampling of pollutants

in conveyance); *Sierra Club v. Louisville Gas & Elec. Co.¸* No. 3:14-cv-391-DJH, 2015 WL 5105216, at *3 (W.D. Ky. Aug. 31, 2015) (sampling of pollutants at point source discharge); *State of Ga. v. City of E. Ridge, Tenn.*, 949 F. Supp. at 1577 (sampling of pollutants in receiving waterbody).

In the Amended Complaint, Plaintiffs allege three separate occasions where constituents of polluted wastewater were identified in samples taken in three conveyances discharging to the Unnamed Tributary, as well as in the Unnamed Tributary. [Doc. 21 ¶¶ 93–95]. Results from those sampling events identified *E. coli*, Total Coliform, Phosphorus, Ammonia, and Total Kjeldahl Nitrogen in one or multiple of those locations, including the Existing Drainage Ditch, Newly Constructed Trench, Second Newly Constructed Trench, and the Unnamed Tributary. *Id.*

Defendants do not dispute the legitimacy of those sampling results, and they admit that the results show "high" and "elevated" pollutant levels. [Doc. 25 at 5, 9]. Nevertheless, Defendants mischaracterize the results as "insufficien[t]" and "inconsisten[t]" based on the varying pollutants and pollutant concentrations identified in each sample. *Id.* at 9–10. Defendants also point to the comparatively higher levels of *E. coli* identified in the Unnamed Tributary on a single sampling date to assert that "pollution of water in the Unnamed Tributary cannot be presumed" to originate from the Ridgewater facility, and to raise the possibility of "the existence of some other source of pollutants." *Id.* at 10.

Defendants are wrong, and moreover such arguments are inappropriate at this stage of litigation. Although Defendants are entitled to challenge Plaintiffs' proof at trial, Plaintiffs are not required to prove their entire case in their initial pleading. At the motion to dismiss stage, the Court must view all facts in a light most favorable to Plaintiffs and accept well-pleaded facts as true. *Ashcroft*, 556 U.S. at 678. It is therefore inappropriate for Defendants to ask the Court to speculate

about whether other, unidentified sources could be contributing pollution to the Unnamed Tributary.

### C. Plaintiffs Are Not Required to Allege Individual Constituents of Wastewater to State Valid Claims Under the Clean Water Act Because Wastewater Itself is a Pollutant.

Defendants singular focus on the sampling results of wastewater pollutant constituents like *E. coli*, Total Coliform, and Phosphorus is misplaced. Although those parameters are unquestionably pollutants under the CWA, so too is wastewater writ large. Plaintiffs have therefore alleged persistent and ongoing discharges of polluted wastewater in violation of the CWA on at least thirteen dates in the Amended Complaint. [Doc. 21 ¶ 105].

In furtherance of its goal to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," Congress recognized that domestic wastewater—both before and after treatment—is considered a "pollutant" under the CWA. 33 U.S.C. § 1251(a); *id.* at § 1362(6). Accordingly, Congress defined the term "pollutant" to include both "sewage" (i.e. pretreated domestic waste) and "municipal waste" (i.e. post-treated domestic waste). *Id.* at § 1362(6).

Agency implementation and judicial interpretation confirm that domestic wastewater itself—regardless of treatment and irrespective of discrete constituents—is considered a "pollutant" under the CWA. Pursuant to the EPA's NPDES permitting program, "owners or operators of any treatment works treating domestic sewage" are subject to program requirements regardless of the level of waste treatment achieved by those systems. *See* 40 C.F.R. § 122.1(b)(2). And courts, including the U.S. Supreme Court, routinely identify wastewater effluent as a "pollutant" without undertaking any analysis to evaluate the extent to which certain constituents remain in the wastewater post-treatment, prior to discharge, or in the receiving water itself.

For example, in *County of Maui, Hawaii v. Hawaii Wildlife Fund*, the Supreme Court described how the county's wastewater facility "collects sewage from the surrounding area,

21

partially treats it, and pumps the treated water through four wells hundreds of feet underground." 140 S. Ct. at 1469. Throughout its analysis, the Supreme Court consistently referred to the treated effluent as a pollutant without grappling with the effect of the county's treatment or the constituents remaining in the wastewater prior to discharge. *See, e.g.*, *id.* at 181; *see also Hawai'i Wildlife Fund v. Cnty. of Maui*, 550 F. Supp. 3d 871, 890 (D. Haw. 2021) ("Even if the wastewater that reaches the ocean from the wells contains lesser levels of pollutants than at the start of the wastewater's journey from the wells, that wastewater maintains its specific identity as polluted water emanating from the wells.").

The Sixth Circuit has explained that the CWA "prohibits the discharge of any pollutant, *including effluent from sewage treatment plants*, into waters of the United States, except in accordance with a [NPDES] permit." *United States v. Confederate Acres Sanitary Sewage and Drainage Sys., Inc.*, 935 F.2d 796, 798 n.1 (6th Cir. 1991) (emphasis added). And courts routinely identify wastewater effluent—treated or otherwise—as a pollutant under the CWA. *See, e.g., United States v. Gulf Park Water Co., Inc.*, 972 F. Supp. 1056, 1061 (S.D. Miss. 1997) (finding CWA liability for the unpermitted discharge of treated wastewater effluent into local bayous); *United States v. Saint Bernard Par.*, 589 F. Supp. 617, 619 (E.D. La. 1984) (finding CWA liability for raw sewage discharge from a wastewater treatment plant).

The CWA's prohibition on wastewater discharges without a valid NPDES permit extends to septic and land application systems, particularly where failure of those systems results in effluent unlawfully entering surface waters. In *Friends of Sakonnet*, a district court imposed civil penalties on a wastewater treatment provider who operated a failing land application system which allowed sewage to "run[] directly from the leaching field, on the surface of the ground for approximately 250 feet, into the Sakonnet River." 738 F. Supp. at 628. The court stated that there

22

was "no question" that the "noxious flow that has poured freely into the Sakonnet River" from defendant's treatment system was illegal without a NPDES permit. *Id.* at 630; *see also United States v. Lucas*, 516 F.3d 316, 333–334 (5th Cir. 2008) (noting that discharges from septic systems to jurisdictional wetlands were subject to NPDES permitting requirements).

As acknowledged by Defendants, Plaintiffs allege that Defendants have and continue to "discharge[] polluted wastewater" from the Ridgewater land application area into surface waters. *See* [Doc. 25 at 7]. That wastewater, in addition to the individual bacteriological and nutrient constituents contained therein, constitutes a "pollutant" under the CWA. Plaintiffs' recitation of at least thirteen dates on which Defendants discharged polluted wastewater into federal waters without a NPDES permit—and the narrative, visual, and scientific evidence described in connection with those dates—is sufficient to state a plausible claim for relief.

**D. Defendants' Performance Pursuant to SOP-03009 Provides Evidence that Wastewater Is Discharging From the Ridgewater Facility to Surface Waters.**

To sufficiently plead their case, Plaintiffs must include "sufficient factual matter" in their complaint which, taken as true, allows the Court to draw a reasonable inference that Defendants are liable for the misconduct alleged. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Evidence to aid the Court in this exercise can include direct evidence, circumstantial evidence, and even evidence which may implicate Defendants' liability under other laws, regardless of whether they are pleaded. FED. R. EVID. 401; *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 514 n.3 (6th Cir. 2013). Such is the case here.

In the Amended Complaint, Plaintiffs allege facts related to Defendants' operation—and TDEC's oversight—of the Ridgewater facility under SOP-03009, a state operating permit issued by TDEC. Plaintiffs reference this evidence in their Amended Complaint *not*, as Defendants assert,

to plead violations of that permit or any Tennessee state laws. *See* [Doc. 25 at 8, 10]. Rather, the conditions of SOP-03009, Defendants' performance (or non-performance) of its terms, and TDEC's inspection and enforcement actions all provide factual support for Plaintiffs' allegations that Defendants have and continue to discharge pollutants from the Ridgewater drip field into the Unnamed Tributary of the Cumberland River at Old Hickory Lake.

The CWA makes it unlawful for a person to discharge pollutants into waters of the United States without a NPDES permit. 33 U.S.C. § 1311(a); *see also Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1524–25 (11th Cir. 1996) ("CWA absolutely prohibits the discharge of any pollutant by any person, unless the discharge is made according to the terms of an NPDES permit") (emphasis omitted); *Driscoll v. Adams*, 181 F.3d 1285, 1289 (11th Cir. 1999) (obtaining non-NPDES permits insufficient to comply with CWA). Tennessee is authorized to administer the NPDES permitting program within its borders, which it does through the TWQCA and implementing regulations. *See* 33 U.S.C. § 1342; Tenn. Code Ann. § 69-3-108; Tenn. Comp. R. & Regs. 0400-40-05.

Because the Unnamed Tributary is a water of the United States, Defendants are required to obtain a NPDES permit from TDEC before legally discharging pollutants into it.[5] Defendants do not have a NPDES permit, and no such discharges are authorized. Instead, TDEC issued SOP-03009 to WWAWC for operation of the Ridgewater drip dispersal facility, and that state permit expressly prohibits any type of offsite discharge.[6]

Facts regarding Defendants' abysmal performance under SOP-03009—in conjunction with TDEC inspection reports and Notices of Violation, photographs, and sampling data—all provide

---

[5] The Unnamed Tributary is both a water of the United States under the federal CWA, 33 U.S.C. § 1362(7), and a state water under the TWQCA, Tenn. Code Ann. § 69-3-103(48). Thus, the Unnamed Tributary is subject to both federal and state jurisdiction under each respective statute.
[6] The Ridgewater facility is also permitted under Underground Injection Control Authorization No. WLS000288 to allow subsurface distribution of sanitary waste. [Doc. 21 ¶ 49 n.2].

evidence that Defendants have and continue to violate the CWA by discharging polluted wastewater to the Unnamed Tributary. For example, during site visits over the past five years, TDEC repeatedly observed polluted wastewater discharging offsite from the Ridgewater land application area into the Unnamed Tributary and conveyances leading thereto. TDEC documented those unlawful discharges in site inspection reports [Doc. 21 ¶¶ 61, 63, 66, 67, 71, 74, 76, 77, 83, 84, 86, 87], through photographs [*Id.* ¶¶ 62, 64, 69, 72, 78, 81, 85, 86, 88, 95], in Notices of Violations [*Id.* ¶¶ 65, 79], and via sampling [*Id.* ¶ 95]. The Amended Complaint also alleges facts demonstrating that the Ridgewater land application area is undersized [*Id.* ¶ 59], regularly overloaded with wastewater effluent [*Id.* ¶ 53], and repeatedly subject to high levels of *E. coli* releases [*Id.* ¶ 52], all in contravention of the terms and conditions in SOP-03009. All of those allegations are directly relevant to Plaintiffs' claims that Defendants are discharging polluted wastewater from the land application area into the Unnamed Tributary in violation of the CWA.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to Dismiss [Doc. 24] be DENIED.

Respectfully submitted,

*/s/ Stephanie Biggs*
Stephanie Biggs, TN BPR No. 036734
George Nolan, TN BPR No. 014974
SOUTHERN ENVIRONMENTAL LAW CENTER
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
sbiggs@selc.org
gnolan@selc.org

25

James S. Whitlock, NC Bar No. 34304
Admitted *Pro Hac Vice*
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Avenue, Suite 304
Asheville, NC 28801
Telephone: (828) 258-2023
jwhitlock@selc.org

26

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2026, a copy of the foregoing document has been electronically filed with the Clerk of Court using the CM/ECF system which will automatically email all counsel of record.

*/s/ Stephanie Biggs*
Stephanie Biggs

*Counsel for Tennessee Scenic Rivers Association and Sierra Club*